IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BOBBI S.,**[1]<br><br>    **Plaintiff,**<br><br>v.<br><br>**COMMISSIONER OF SOCIAL SECURITY,**<br><br>    **Defendant.** | Case No. 3:20-CV-561-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Bobbi S., through counsel, seeks judicial review of the final agency decision denying her application for Supplemental Social Security (SSI) benefits pursuant to 42 U.S.C. § 423.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on July 24, 2014, alleging a disability onset date of August 26, 2006. After holding an evidentiary hearing, an Administrative Law Judge (ALJ) denied Plaintiff's application in June 2017. (Tr. 53-72). The Appeals Council granted Plaintiff's request for review and adjusted the ALJ's decision. (Tr. 1-9). Nevertheless, the Appeals Council found the adjustment would not change the outcome of Plaintiff's case and, thus, found Plaintiff was not disabled. (*Id.*).

Plaintiff appealed that decision to this District Court pursuant to 42 U.S.C. § 1383. (Tr. 1337-49). On June 20, 2019, the parties agreed to a motion for remand, which was

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

signed by now-retired Magistrate Judge Donald G. Wilkerson. (Tr. 1350-60). Plaintiff had another hearing before an ALJ, but on February 14, 2020, that ALJ also found Plaintiff was not disabled. (Tr. 1248-72). Plaintiff now appeals that decision directly to this Court, pursuant to 42 U.S.C. § 1383(c) and 20 C.F.R. § 404.984.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises two issues:

1. The ALJ's analysis of the opinion evidence was legally insufficient, and his decision to discount opinions of Plaintiff's treating providers and an examining doctor's opinions, while relying on the opinions of a non-examining psychologist, was not supported by substantial evidence.

2. The ALJ's evaluation of Plaintiff's subjective symptoms was legally insufficient, and his decision to discount her statements about her symptoms and limits is not supported by substantial evidence.

## LEGAL STANDARD

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a five-step process for assessing if a claimant is disabled. The Seventh Circuit Court of Appeals has summarized the steps:

> "The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled."

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Once an assessment has been made and a claimant appeals a denial, this Court may only review the Commissioner's decision to ensure that the decision is supported by substantial evidence and that the Commissioner made no mistakes of law. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive. . . ." 42 U.S.C. § 405(g). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). "Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence." *B. v. Comm'r of Soc. Sec.*, No. 17-cv-1243-DGW, 2020 WL 230594, at *4 (S.D. Ill. Jan. 15, 2020).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court will not reweigh the evidence, assess credibility, or otherwise substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The ALJ need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence and requires the court to remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### I. Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing on January 10, 2020

(Tr. 1277). Plaintiff testified that she had not worked since 2003 other than selling Avon. (Tr. 1286). Plaintiff stated that she suffers from: tachycardia; bradycardia; arthritis pain in her legs, lower and mid back, and her neck; worsening fibromyalgia and/or a mixed connective tissue disease; severe anxiety; insomnia; post-traumatic stress disorder; multiple sclerosis that has caused her limbs to give out; and asthma. (Tr. 1287-88). Plaintiff also testified that she has been prescribed a Qvar inhaler, Albuterol, Singulair, Ritalin, Xanax, and an arthritis medicine. (Tr. 1288). She stated that her doctors change her medication or the dosage about once a month. (Tr. 1291). She sees a psychiatrist once a month and a counselor once a week. (Tr. 1294-95).

Plaintiff stated she is barely able to drive, but does go to the grocery store down the street once or twice a week. (Tr. 1289). Plaintiff is able to do her own shopping, dishes, and laundry. Outside of those chores, Plaintiff testified she spends 80 percent of her time in bed because it hurts to sit on the couch, sit in a chair, or to stand. (Tr. 1290). Between July 2014 and February 2016, Plaintiff had about one good day a month, but since 2016 she is lucky to have one good day every two months. (Tr. 1297-98). Plaintiff testified that she often wakes up in the middle of the night with severe aching and swelling so severe she cannot walk or go back to sleep, so she sleeps during the day. (Tr. 1298-99). Plaintiff further testified that her pulse often speeds up, which makes it extremely hard for her to function. (Tr. 1300). Her PTSD and anxiety have dramatically worsened, and they are not helped by her counseling sessions. (Tr. 1288-89). She is afraid to drive while on her anxiety medicine, so if she has to drive, she will not take it. (Tr. 1298).

Michael Klein, a vocational expert, also testified at the hearing. Klein testified that

individuals with Plaintiff's RFC could perform a number of jobs including a retail marker, produce weigher, office cleaner, charge account clerk, assembler, or a document preparer. (Tr. 1304). When asked by Plaintiff's counsel how many absences would be permitted by an employer of one of these jobs, Klein testified that absences or tardiness would be permissible one day a month. (Tr. 1305). And any off-task behavior above 10% would be unacceptable. (Tr. 1305).

## II. Relevant Medical Records

Plaintiff, who is now 49 years old, has been dealing with depression and anxiety on a daily basis since she was 11 years old. (Tr. 810-14). In 2014, Plaintiff began seeing Mary Declue, APN, who managed her psychotropic medications for depression and anxiety, as well as excessive worrying, hallucinations, nightmares, flashbacks of past traumas in her married life, anger, difficulty sleeping, racing thoughts, and lack of energy. (Tr. 355, 397, 442). Declue and Plaintiff's primary care provider, Micah Oakley, P.A.C., noted Plaintiff expressed unusual beliefs including that her ex-husband poisoned her with radiation, was recording her, and was having people follow her. She also believed that the government was trying to poison her with electromagnetic radiation, and that the government hacked her computer and phone. (Tr. 340, 352, 408, 442-43). She further was concerned that her ex-boyfriend was making meth in her house, that the police were involved in the meth making, that old men were following her, and that her ex was pulling wires out of her house. (Tr. 442). Plaintiff refused treatment for her delusions. (Tr. 342). Declue noted Plaintiff had otherwise normal examination findings such as normal insight, judgment, attention span, concentration, and thought process.

(Tr. 355, 360, 365, 370, 379-80, 390, 401, 441). By November 2014, however, Declue assessed Plaintiff with anxiety, bi-polar disorder, PTSD, ADHD, and paranoid-type schizophrenia. (Tr. 437, 442). Declue noted that, although Plaintiff had normal attention span and concentration, she had a deficient fund of knowledge, was in denial, was fearful, had hallucinations, mood swings, paranoia, poor insight, poor judgment, and obsessive thoughts. (Tr. 446).

In early 2015, Plaintiff began going to Centerstone for psychiatric services with Reno Ahuja, M.D. (Tr. 817-860). Dr. Ahuja diagnosed Plaintiff with a Global Assessment of Functioning (GAF) Score of 32, which indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. (Tr. 818). He also noted that Plaintiff had generalized anxiety disorder and major depressive disorder but that her prognosis was fair and that she self-reported feeling "ok." (Tr. 818).

In November 2015, Plaintiff reported a worsening of symptoms to Dr. Ahuja due to stress, and she was tearful about being in an abusive relationship, her financial difficulties, and her trust issues. (Tr. 845). She also stated that she slept 15 hours a day and would like to stay in bed. Dr. Ahuja found that Plaintiff had fair concentration, intelligence, insight, and judgment. (Tr. 842). Plaintiff was not, however, compliant with her prescribed medications including Klonopin and Ritalin. (Tr. 858).

By December 2016, very little had changed. Dr. Ahuja noted Plaintiff had questionable personality traits, but logical thought processes, a good appearance, normal alertness, fair concentration, fair insight, and normal speech. (Tr. 826-28). He further

noted that despite Plaintiff reporting multiple infections since her last visit with leg swelling, pain, and difficulty walking, her primary care physician found nothing conclusively wrong. (Tr. 827). Plaintiff been recommended for a referral with a neurologist, but she declined. (Tr. 827-28).

On April 17, 2017, Plaintiff underwent a psychological consultative examination with Dr. Fred Klug at the request of the Administration. Dr. Klug, a licensed clinical psychologist, observed that Plaintiff's dress, hygiene, and grooming were unkempt. (Tr. 1240). Her memory and attention span were impaired, and she was unable to spell "truck" backwards. (Tr. 1240). Plaintiff's concentration, reasoning, abstract thinking, ability to do simple calculations, insight, and judgment were poor. (Tr. 1242). Additionally, her intellectual functioning appeared to be borderline, and her fund of knowledge was not commensurate with her education. (Tr. 1241). Yet, she showed no signs of central nervous system deficits, her word fluency was adequate, and there was no evidence of hallucinations, obsessions, or compulsions. (Tr. 1241-42).

Dr. Klug found that Plaintiff frequently worries, her affect was labile, and her predominant mood was dysphoric and nervous. (Tr. 1242). Dr. Klug opined that Plaintiff could not participate in the management of her own funds. (Tr. 1243). Dr. Klug concluded that Plaintiff had only mild limitations with understanding, remembering, and carrying out simple instructions, as well as the ability to make judgments on simple work-related decisions. (Tr. 1244). Plaintiff had moderate limitations with regard to complex instructions and work-related decisions, but would still be able to function satisfactorily. (Tr. 1244). According to Dr. Klug, Plaintiff also would be moderately limited with regard

to acting appropriately with the public, her supervisors, co-workers, and to changes in her routine work setting. (Tr. 1245). Dr. Klug found no other capabilities were affected by Plaintiff's impairments. (Tr. 1245).

Dr. Maricelina Caro, a non-examining expert, reviewed the record and opined that Plaintiff could sit for five hours in an 8-hour day and stand and walk two hours each in an 8-hour day. (Tr. 1557-62). Plaintiff also could never climb ladders or scaffolds but she could frequently climb ramps, balance, stoop, kneel, crouch, and crawl. Further, Plaintiff could frequently reach overhead with both arms and operate foot controls with both feet. She could tolerate no exposure to unprotected heights, occasional exposure to moving mechanical parts and operation of a motor vehicle, and frequent exposure to humidity, wetness, pulmonary irritants, extreme temperatures, and vibration. (Tr. 1557-62).

Dr. Michael Lace, a non-examining psychologist, found that Plaintiff suffers from psychosis, generalized anxiety disorder, PTSD, and major depression/ mood disorder. (Tr. 1569). Dr. Lace noted that the conditions combined are severe but did not meet or equal any Listing of Impairment. (Tr. 1569). He further found Plaintiff's mental status is variable with good recovery between hospitalizations/periods of decompensation. (Tr. 1569). Dr. Lace concluded found that the record supports moderate limitations with some significant restrictions, including being limited to simple, routine, repetitive tasks with no fast-paced activities, limited to work in a single location, and limited to occasional contact with co-workers, supervisors, and the general public. (Tr. 1571-73).

## DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. The ALJ

found that Plaintiff had not engaged in substantial gainful activity since July 24, 2014, the date of Plaintiff's application. (Tr. 1254). The ALJ then recounted Plaintiff's severe impairments, which significantly limit her ability to perform basic work activities, including degenerative disc disease and spine disorder, Sjogren's syndrome, asthma, migraine headaches, nervous system/connective tissue disorder/lupus, osteoarthritis of the knees, Raynaud's disorder, fibromyalgia, depression, anxiety, PTSD, mood disorder, and psychosis not otherwise specified (NOS). (*Id.*). The ALJ also noted that Plaintiff has been assessed with IBS, systemic sclerosis scleroderma, and MRSA, but that the record did not establish more than minimal limitations due to these impairments. (*Id.*). Further, while Plaintiff had many complaints of abdominal pain, imaging of the abdomen did not indicate active disease or acute disease process. (*Id.*). The record also did not show that Plaintiff had an active MRSA infection during the relevant period of adjudication, and there was little evidence to support a diagnosis of systemic sclerosis scleroderma. (*Id.*).

After considering all of Plaintiff's medically determinable impairments, including those not deemed to be severe, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listing of Impairments in 20 CFR §§ 416.920(d), 416.925 and 416.926. The ALJ acknowledged that Plaintiff has moderate limitations caused by her mental impairments; however, she does not suffer from one extreme limitation or two marked limitations in a broad area of functioning to satisfy the criteria of listings 12.03, 12.04, and 12.06.

After considering the record and the objective medical evidence, the ALJ concluded that Plaintiff has the RFC to perform sedentary work and that she can lift,

carry, push, and pull 20 pounds occasionally and 10 pounds frequently. Plaintiff also can sit about five out of eight hours in a workday, stand two out of eight hours, and walk for up to one consecutive hour. Although she can never climb ladders, ropes, or scaffolds, she can frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. The ALJ found Plaintiff is limited to simple, routine, repetitive tasks with no fast-paced activities, and she must work in a stable setting where there is little change in terms of tools used, the processes employed, or the setting itself, and change, where necessary, is introduced gradually. Finally, Plaintiff is limited to no more than occasional contact with co-workers, supervisors, and the general public throughout the workday. Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

In making his finding, the ALJ relied on evidence that, while Plaintiff often had subjective reports of pain and other symptoms, her doctors could not substantiate her claims with any objecting findings upon examination. (Tr. 1258-1259). Plaintiff reported in 2017 that she could not work because she had been sick since 2008 with connective tissue diseases and lupus, but two rheumatology specialists found no evidence of an autoimmune disorder. (Tr. 1262). Likewise, while Plaintiff reported on November 30, 2016, that her MS kept her from being able to do physical work, lift heavy objects, or sit or stand for prolonged periods, there is nothing in the record to support an assessment of MS, and she is not being treated for MS. (Tr. 1262). There also was little if any objective evidence of, among other things, cardiac impairments, neuropathic pain, metastatic

breast cancer (as Plaintiff reported in April 2018), a plaque on her brain, or bladder stones. (Tr. 1262-63). In sum, the ALJ found Plaintiff's subjective reports unreliable, as the weight of the objective evidence did not support her subjective reports. (Tr. 1263).

The ALJ further explained that while new evidence at the hearing showed Plaintiff was assessed with GAF scores in the low 30s—indicating some impairment in reality testing or communication—she was able to perform most activities of daily living, including driving, shopping, taking care of her animals, preparing meals, and doing household chores. (Tr. 1261). Further, her mental status examination was normal, and she reported doing "ok." (Tr. 1264). Accordingly, the ALJ gave little weight to the opinion regarding her GAF scores, including the opinion of Dr. Reno Ahuja, Plaintiff's mental health care provider, and found she had only moderate limitations in mental functioning. (Tr. 1261). The ALJ remarked that Dr. Ahuja's opinion was given little weight because "it is not consistent with the opinion of the medical expert nor the bulk of the mental health objective exam findings detailed in this decision." (Tr. 1264).

On the other hand, the ALJ gave substantial weight to the opinion of the non-examining psychological expert, Dr. Lace, who reviewed the record and found that Plaintiff had mild to moderate limitations in all areas of mental functioning. (Tr. 1265). Dr. Lace also determined that Plaintiff's general mental status was variable with good recovery between hospitalizations and periods of decompensation. (Tr. 1265). The ALJ found that Dr. Lace's opinion corresponded with the record, which showed that Plaintiff had episodes of delusional behavior that appeared to wax and wane, while her mental status examinations were primarily normal or showed only mild symptoms. (Tr. 1265).

Based on the testimony of the vocational expert, along with the record evidence, Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff has not been under a disability as defined by the Social Security Act since the date her application was filed. (Tr. 1267).

## DISCUSSION

### I.     The ALJ's Evaluation of the Opinion Evidence

Plaintiff first argues the ALJ's analysis of the opinion evidence was legally insufficient, and his decision to discount the opinions of Plaintiff's treating providers and an examining doctor's opinions, while relying on the opinions of a non-examining psychologist, was not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ gave Dr. Klug's opinions substantial weight because he found Plaintiff had moderate limits in her ability to function in a work setting, and the record indicates moderate limits in functioning. In giving Dr. Klug's opinions substantial weight, however, the ALJ failed to mention *all* of Dr. Klug's conclusions. For example, Dr. Klug found Plaintiff had an impaired attention span, as well as impaired immediate, short-term, and long-term memory, but the ALJ did not explain how these impairments would affect her ability to perform work-related tasks. Plaintiff contends that the ALJ's decision is not supported by substantial evidence where his decision indicates two inconsistent findings—*i.e.*, that he gave substantial weight to Dr. Klug's opinions, but did not adopt all of Dr. Klug's opinions in coming to his RFC assessment.

Similarly, the ALJ gave little weight to Dr. Ahuja's opinion that Plaintiff had a GAF score of 32, meaning some impairment in reality testing or communication, or major

impairment in several areas. Furthermore, in discounting the GAF score of 32, the ALJ did not explain why Plaintiff's ability to perform daily activities like caring for herself and her animals undermines the fact that Plaintiff had significant delusions and major impairments in judgment, mood, thinking, and family relationships. Instead, the ALJ cherry-picked one treatment note in which Dr. Ahuja found Plaintiff was doing "ok," her anxiety was up and down, mood was fine, concentration was better, and her motivation was good. That same note, however, indicates Plaintiff was convinced she had black mold in her home, was having flashbacks and crying spells, and had disturbed sleep. Plaintiff points out that the ALJ did not discuss any other treatment notes from a file that includes more than 2,000 pages of records, and his decision cannot be supported by substantial evidence when he was impermissibly selective about the evidence he considered.

Finally, Plaintiff contends that the record does not support the substantial weight the ALJ gave to Dr. Lace's opinion that Plaintiff's mental status was variable with good recovery between episodes of decompensation. Instead, the record demonstrates that Plaintiff experienced persistent paranoia and delusions about a number of issues including mold in her home, people following her, people making meth around her, being spied on or videotaped, the government poisoning her and setting fires in her neighborhood, her phone and laptop being hacked, people stealing her identity, people selling her medical records overseas, and her ex-husband selling her into sex trafficking. Even if these issues were episodic, Plaintiff argues, a claimant's RFC is a statement of what she can do on an ongoing and consistent basis. If Plaintiff's delusions and paranoia affected her ability to work, even if sporadically, that could have a significant impact on

Plaintiff's ability to engage in consistent work.

In response, the Commissioner asserts that the ALJ properly discounted the "significant abnormalities" or inconsistencies in the examination findings. As to Dr. Klug, the ALJ did not give substantial weight to the entirety of Dr. Klug's report, but rather he found that her mental status evaluation was inconsistent with the rest of her mental status evaluation findings and, therefore, was not likely representative of her baseline functioning. Moreover, the ALJ properly discounted the significance of Plaintiff's GAF score because it was inconsistent with Dr. Lace's opinion, Plaintiff's ability to maintain independent living, and with Plaintiff's consistently normal mental status evaluations. Finally, the ALJ was entitled to rely on Dr. Lace's opinion that Plaintiff was mildly to moderately limited in all four areas of mental functioning known as the B criteria, but that her conditions were not *per se* disabling. The Commissioner contends that the ALJ rightfully accorded this opinion substantial weight because it also was consistent with Plaintiff's mostly normal mental status examinations.

After reviewing the entire record, the Court agrees with Plaintiff. The ALJ cannot cherry pick records from Plaintiff's "good days," ignoring her bad days and how those symptoms would limit her ability to work. *See Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012) ("Farrell's RFC should not have been measured exclusively by her best days; when a patient like Farrell is only unpredictably able to function in a normal work environment, the resulting intermittent attendance normally precludes the possibility of holding down a steady job."); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (ALJ must consider whether one who suffers good and bad days could hold a job). Dr. Klug found Plaintiff

had impaired attention span and memory, but the ALJ did not consider how these impairments would affect Plaintiff's ability to work, nor did he ask the vocational expert about any limitations created by those impairments. As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *Indoranto v. Barnhart*, 374 F.3d 470, 473–74 (7th Cir. 2004) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."). The Seventh Circuit has been very clear that a limitation to simple instructions or simple, routine tasks does not adequately account for a moderate limitation in maintaining concentration, persistence, or pace. *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) ("As we have labored mightily to explain, however, the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace. . . . Put another way, someone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be."); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.").

Here, Dr. Klug found that Plaintiff had poor attention span, poor concentration, poor short-term memory, impaired immediate memory, and marginal long-term memory. And the ALJ found that Plaintiff has a moderate limitation with regard to

concentrating, persisting, or maintaining pace, noting that Plaintiff's significant delusions and paranoia could reasonably interfere with her ability to persist or maintain pace for extended periods. Yet, the hypothetical posed to VE Michael Klein did not mention any issues with concentration, persisting, pace, attention, or memory issues.

The Court also struggles with the Commissioner's interpretation of Plaintiff's mental status evaluations as "consistently normal" and his argument that the ALJ properly discounted the significance of Plaintiff's GAF score because it was inconsistent with Dr. Lace's opinion and Plaintiff's ability to maintain independent living. First, a full reading of the record indicates Plaintiff's mental status evaluations were consistently *abnormal*. From her evaluations by Nurse Declue in 2014 through her most recent Centerstone records from 2019, Plaintiff struggles to cope with anxiety and depression on a daily basis to the extent that she cannot get out of bed. Plaintiff is paranoid and delusional, and suffers from irrational thoughts and hallucinations. (*See, e.g.*, Tr. 2019, 2137). Second, Plaintiff's ability to live independently—to the extent staying mainly indoors, sleeping all day, and worrying all night is considered living—"does not mean that she can manage the requirements of a modern workplace." *Punzio*, 630 F.3d at 712.

To that end, the Court also finds the ALJ erred in discounting Dr. Ahuja's GAF score of 32 because she was able to perform most activities of daily living, including driving, shopping, taking care of her animals, preparing meals, and doing household chores. In fact, substantial evidence in the record indicates Plaintiff did not do many chores, did not cook but rather ate one fast food meal per day, and did not drive other than to her doctor appointments and the grocery store. (*See, e.g.*, Tr. 1375-76). Even if

Plaintiff did these activities of daily living, she still had significant delusions and severe anxiety and depression that would surely affect her ability to function in the workplace. *See id.* ("Concluding that the claimant 'is not a raving maniac who needs to be locked up' is a far cry from concluding that she suffers no limits on her ability to function.").

An ALJ must give "controlling weight" to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2). When an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision. *Id.* Here, the ALJ erred in failing to give controlling weight to Plaintiff's treating doctors' opinions while giving substantial weight Dr. Lace's opinion that Plaintiff's general mental status was variable with good recovery between hospitalizations and periods of decompensation. That opinion simply is not supported by the substantial evidence in the record.

II.   **The ALJ's Evaluation of Plaintiff's Subjective Symptoms**

Plaintiff next argues the ALJ erred in discounting Plaintiff's statements about her symptoms and limitations because they are not supported by objective evidence. Plaintiff argues that a symptom like pain cannot be objectively measured or verified, particularly with diagnoses such as lupus and fibromyalgia. Additionally, some of Plaintiff's reported conditions could be attributed to her lack of understanding and sophistication regarding medical diagnoses. Finally, the ALJ should have considered the combination of Plaintiff's mental and physical impairments, as it is well-recognized that pain and mental conditions, particularly depression, can exacerbate each other.

In response, Defendant points to the fact that Plaintiff never sought treatment for her supposed physical ailments like MS or her lack of muscle atrophy, as well as reports that she occasionally went bowling and to festivals. Defendant contends that the ALJ was entitled to rely on these factors when they were not consistent with Plaintiff's allegations that she does nothing but lay in bed all day.

The Court is not convinced by Defendant's argument. The record presents the picture of a woman who is deeply disturbed and confused by her diagnoses. For example, in one medical record, Plaintiff gave a history of "plaques on my brain that they compared to MS in 2008." (Tr. 350). It is easy to see how a woman with paranoid delusions who struggles with rational thinking also perhaps truly believed she had been diagnosed with MS. Furthermore, while Defendant argues Plaintiff never sought treatment for her alleged conditions, the substantial evidence in the record demonstrates that she constantly saw doctors, took Tylenol for her pain, and took other prescribed medication such as Lyrica for her fibromyalgia when it was available through her insurance.

Even if the ALJ properly discounted Plaintiff's subjective complaints about her physical ailments, he still should have considered her subjective accounts of her mental impairments. As noted by Plaintiff, the ALJ recognized that Plaintiff suffered from severe psychosis, but then discounted Plaintiff's statements about her mental health because she was able to perform activities of daily living and had very few involuntary or voluntary mental health hospitalizations. The Court agrees with Plaintiff that there is a large difference between being able to live on one's own (despite significant delusions) and being able to work on a consistent basis.

CONCLUSION

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations omitted.) Here, both the assessment of the opinion evidence and Plaintiff's subjective allegations were not supported by substantial evidence. The Court must conclude that the ALJ failed to build the requisite logical bridge.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

DATED:   September 20, 2021

s/<u>Nancy J. Rosenstengel</u><br>
NANCY J. ROSENSTENGEL<br>
**Chief U.S. District Judge**